HEIKE et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. October 10, 1911.)

No. 233.

1. CRIMINAL LAW (§ 42*)—IMMUNITY TO ONE FURNISHING EVIDENCE—CONSTRUCTION OF STATUTE.

Testimony given by an officer of a corporation before a federal grand jury investigating charges of violation of the anti-trust law by the cor-

poration, which consisted in statements of facts shown by the records of the corporation which he produced in obedience to a subpœna duces tecum, does not entitle him to immunity from prosecution for an offense against the United States committed in his official capacity, but which has no connection with the matter then being investigated under Act Feb. 25, 1903, c. 755, § 1, 32 Stat. 904 (U. S. Comp. St. Supp. 1909, p. 1142), which provides with respect to the anti-trust act and others mentioned that "no person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceeding, suit or prosecution under said acts."

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 45–48; Dec. Dig. § 42.*]

2. CRIMINAL LAW (§ 42*)—IMMUNITY TO ONE FURNISHING EVIDENCE—CONSTRUCTION OF STATUTE—"TESTIFY"—"PRODUCE EVIDENCE."

Statements compiled by employés of a corporation from its books and records, which were before a grand jury and produced to the grand jury by an officer of the corporation on a subpœna duces tecum, do not constitute testimony given or documentary evidence produced by such officer within the meaning of Act Feb. 25, 1903, c. 755, § 1, 32 Stat. 904 (U. S. Comp. St. Supp. 1909, p. 1142), which grants immunity in certain cases to a witness "on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise"; the preparation or production of the statements in such case being the act of the corporation, and not of the witness.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 45–48; Dec. Dig. § 42.*

For other definitions, see Words and Phrases, vol. 6, p. 5654; vol. 8, p. 6932.]

3. STATUTES (§ 161*)—IMPLIED REPEAL BY ACT RELATING TO SAME SUBJECT.

Where there is no express repeal of an earlier statute, the question whether or not a subsequent enactment, dealing with the same general subject and to some extent overlapping the older legislation, is to be construed as effecting its repeal, is one of legislative intent; whether Congress intended merely to make additional provisions which might be affirmative or cumulative or auxiliary or to provide a substitute which should take the place of the prior legislation.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 230–243; Dec. Dig. § 161.*

Repeal of statutes by implication, see note to First Nat. Bank v. Weidenbeck, 38 C. C. A. 136.]

4. CUSTOMS DUTIES (§ 125*)—VIOLATION OF CUSTOMS LAWS—FALSE WEIGHTS.

Rev. St. § 5445 (U. S. Comp. St. 1901, p. 3678), which makes it a criminal offense for any person "by any means whatever" to knowingly effect or aid in effecting the entry of any goods or merchandise at less than the true weight or measure thereof or upon a false classification or by the payment of less than the amount of duty legally due thereon, was not repealed by Act June 22, 1874, c. 391, § 12, 18 Stat. 188, nor by the Customs Administrative Act June 10, 1890, c. 407, § 9, 26 Stat. 135 (U. S. Comp. St. 1901, p. 1895), which, while covering in part the same subject-matter of fraudulent entries, are cumulative and not inconsistent.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. § 266; Dec. Dig. § 125.*]

5. CONSPIRACY (§ 43*)—FEDERAL STATUTE—SUFFICIENCY OF INDICTMENT.

An indictment, charging that defendants conspired to commit offenses against the United States by knowingly making and effecting an entry of raw sugars at less than their true weights by means of false and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

fraudulent written statements as to said weights, is sufficiently specific in describing the conspiracy.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 79–99; Dec. Dig. § 43.*]

**6.** CONSPIRACY (§ 33*)—FEDERAL STATUTE—CONSPIRACY TO DEFRAUD UNITED STATES OF CUSTOMS REVENUE.

An indictment, charging a conspiracy to knowingly effect the entry of raw sugars at less than their true weights, states an offense for conspiracy to commit an offense against the United States under Customs Administrative Act June 10, 1890, c. 407, § 9, 26 Stat. 135 (U. S. Comp. St. 1901, p. 1895), which makes it an offense if any person "shall be guilty of any willful act or omission" by means whereof the United States shall be deprived of lawful duties.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 60; Dec. Dig. § 33.*]

**7.** CRIMINAL LAW (§ 429*)—EVIDENCE—OFFICIAL RECORDS OF UNITED STATES.

Dock books kept by assistant weighers in the customs service, in which are recorded their observations of the scales made at the time of weighing imported merchandise, and which are official records of the government, are admissible in a criminal case as prima facie evidence of what they purport to record.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1018; Dec. Dig. § 429.*]

**8.** CRIMINAL LAW (§ 434*)—EVIDENCE—PRIVATE RECORDS.

On the trial of officers of a sugar refining company for conspiracy to defraud the government by effecting the entry of imported raw sugars at less than their true weights, books containing entries of the weights as made by city weighers and recorded by checkers employed by the company, on which the company paid for the sugar, and which for long periods were uniformly in excess of the weights of the same cargoes as made by the custom house weighers on which the duties were paid, were admissible in evidence; the entries, where possible, being authenticated by the persons who made them, and it being further shown that, while defendants had nothing directly to do with the weighing in either case, statements of the cargo weights showing the discrepancy were brought to their attention.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1023; Dec. Dig. § 434.*]

**9.** CRIMINAL LAW (§ 432*)—EVIDENCE—TABULATIONS FROM RECORDS IN EVIDENCE.

Tabulations made by experts employed by the government, who were on the stand and cross-examined, from books of a sugar refining company which were in court, *held* admissible in evidence in a prosecution of officers of the company for conspiracy to defraud the United States.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1021; Dec. Dig. § 432.*]

**10.** CRIMINAL LAW (§ 1170*)—APPEAL AND ERROR—REVIEW—HARMLESS ERROR.

Where, in a prosecution of officers of a sugar refining company for conspiracy to defraud the United States by effecting the entry of imported sugars at less than their true weight, the evidence of the fraudulent weights was overwhelming, the only real question at issue being whether or not defendants knew of and participated in the fraud, evidence that there was a discrepancy between the selling and custom house weights of cargoes imported by others was not material on such issue, where such fact was not known to defendants, and the exclusion of such evidence was not prejudicial error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3145–3153; Dec. Dig. § 1170.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

11. CUSTOMS DUTIES (§ 125*)—CONSTRUCTION OF STATUTE—"ENTRY" OF GOODS.

The word "entry," as used in Rev. St. § 5445 (U. S. Comp. St. 1901, p. 3678), which makes it a criminal offense to knowingly effect the entry of any goods or merchandise at less than the true weight or measure thereof, etc., is used in its broad sense, and includes the series of acts which are necessary to put the goods through the custom house.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. § 266; Dec. Dig. § 125.*

For other definitions, see Words and Phrases, vol. 3, pp. 2400–2408.]

12. CRIMINAL LAW (§ 622*)—MOTION FOR SEPARATE TRIAL—DISCRETION OF COURT.

The granting or denial of a motion for a separate trial by one of a number of defendants jointly indicted for conspiracy is within the discretion of the court.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1380–1390; Dec. Dig. § 622.*]

13. JURY (§ 136*)—PEREMPTORY CHALLENGES—NUMBER.

The offense of conspiracy to defraud or to commit an offense against the United States, defined in Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), was a misdemeanor, and a defendant on trial therefor was entitled to but three peremptory challenges prior to the enactment of Pen. Code, § 335 (Act March 4, 1909, c. 321, 35 Stat. 1152 [U. S. Comp. St. Supp. 1909, p. 1489]), which makes it a felony; and in view of the saving clause of section 343 of such Code, providing that "all offenses committed prior to the taking effect hereof * * * may be prosecuted and punished in the same manner and with the same effect as if this act had not been passed," said section 335 does not apply to prosecutions for an offense committed prior to its enactment and does not entitle the defendant therein to a greater number of challenges.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 607–618; Dec. Dig. § 136.*]

14. CONSPIRACY (§ 47*) — CONSPIRACY TO COMMIT OFFENSES AGAINST THE UNITED STATES—TRIAL—SUFFICIENCY OF EVIDENCE.

Evidence considered, and *held* sufficient to sustain a conviction of defendants of the offense of conspiracy to commit offenses against the United States by effecting the entry of raw sugars at less than their true weights.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. § 47.*]

In Error to the Circuit Court of the United States for the Southern District of New York.

Prosecution by the United States against Charles R. Heike and Ernest W. Gebracht. From a judgment (175 Fed. 852) of conviction, said defendants bring error. Affirmed.

This cause comes here upon writ of error to review the judgments of conviction against plaintiffs in error. They were indicted together with Bendernagel, Walker, Voelker, and Halligan upon an indictment containing six counts. The first four charged that defendants "did unlawfully and knowingly make and effect and aid in effecting" the entry of certain specified cargoes of raw sugar at less than their true weight. The fifth count charged that the defendants had *conspired* "to defraud the United States" of lawful duties upon importations of raw sugar by effecting the liquidation of duties thereon at less than their true weight. The sixth count charged that defendants had conspired on March 1, 1907, "to commit offenses against the United States in and by knowingly making and effecting and aiding in effecting, at less than their true weights, and by means of false and fraudulent written statements as to said weights, entries of certain goods, wares, and

merchandise," to wit, certain dutiable raw sugars which theretofore had been imported and thereafter were continuously to be imported into the Port and Collection District of New York. Of the overt acts set forth in the sixth count four only named Heike. They charged his indorsement of four checks from the United States to the American Sugar Refining Company, purporting to represent respectively an excess of deposits for duties on four different cargoes, but actually representing part of the duties then and there lawfully due to the United States upon these four cargoes.

Heike was secretary of the American Sugar Refining Company, which is a New Jersey corporation. He was also secretary and treasurer of the American Sugar Refining Company of New York. Gebracht was superintendent of the Havemeyer & Elder refinery. Bendernagel was cashier of the refinery. Walker was assistant superintendent of the refinery's docks. Voelker and Halligan were checkers on the docks.

In the course of the trial Walker, Voelker, and Halligan pleaded guilty. The jury found Heike guilty on the sixth count only, and Gebracht guilty as charged in the indictment, on all counts. They reported that they could not agree on a verdict as to Bendernagel.

George S. Graham and John B. Stanchfield (Charles H. Tuttle and William M. Parke, of counsel), for plaintiff in error Heike.

G. M. Mackellar, for plaintiff in error Gebracht.

Henry A. Wise, U. S. Atty. (Henry L. Stimson, Winfred T. Denison, and Felix Frankfurter, Asst. U. S. Atty., of counsel), for the United States.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). Heike filed a special plea in bar, upon which a trial was had and a verdict directed against him by the court. This will be first considered. It will not be necessary to go into the history of the plea nor to enumerate the various motions and exceptions by which it was presented. Suffice it is to say that the point relied upon by him was properly submitted, and the broad question whether upon the facts shown he was entitled to "immunity" under the acts of Congress must be decided.

[1] The Act of February 11, 1893, c. 83, 27 Stat. 443 (U. S. Comp. St. 1901, p. 3173), provides that no person shall be excused from attending and testifying or from producing books, papers, etc., before the Interstate Commerce Commission, or in obedience to the subpœna of the Commission, or in any cause or proceeding, criminal or otherwise, based upon or growing out of any alleged violation of the interstate commerce acts, "on the ground or for the reason that the testimony, or evidence, documentary or otherwise, required of him, may tend to criminate him or subject him to a penalty or forfeiture. But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said Commission or in obedience to its subpœna," etc.

The Appropriation Act of February 25, 1903, c. 755, § 1, 32 Stat. 904 (U. S. Comp. St. Supp. 1909, p. 1142), enumerates several statutes, including the Anti-Trust Act of July 2, 1890 (Act July 2, 1890,

c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), and provides that:

"No person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceeding, suit or prosecution, under said acts."

This statute was amended by the Act of June 30, 1906, c. 3920, 34 Stat. 798 (U. S. Comp. St. Supp. 1909, p. 1168), by adding the provision that such "immunity shall extend only to a natural person who, in obedience to a subpœna, gives testimony under oath or produces evidence, documentary or otherwise, under oath."

On various dates in 1909 and 1910 certain grand jurors of the United States Circuit Court, Southern District of New York, were making inquiry into transactions of the American Sugar Refining Company. One branch of inquiry was in reference to the acquisition and closing up of the Pennsylvania Sugar Refining Company of Philadelphia, arising on the so-called Kissel-Segal loan. The details are sufficiently set forth in Pennsylvania Sugar Refining Company v. American Sugar Refining Company, 166 Fed. 254, 92 C. C. A. 318. These transactions were contended to be a violation of the anti-trust act. The other inquiry was also concerned with alleged violations of the same act. In the first of these inquiries a subpœna duces tecum was directed to "Charles R. Heike, secretary of the American Sugar Refining Company," and served upon him. By it he was summoned to testify and was ordered to bring with him all records of the company, etc., showing minutes of the directors' executive committee relative to the Kissel-Segal loan, and also minutes of the board of directors and all other evidences and writings in his custody concerning the premises. A second subpœna called for certain letters and press copies relating to these transactions. In the other inquiry a subpœna duces tecum was directed to "Charles R. Heike, secretary of the American Sugar Refining Company, and secretary of the American Sugar Refining Company of New York," and served upon him. By it he was summoned to testify and ordered to bring with him certain books and papers of both companies. He obeyed these subpœnas, testified before both these grand juries, and produced various records and papers of the two companies. The question now presented is whether the testimony which he gave and the production of the records and papers which he laid before the grand juries secure him immunity from this prosecution, which has nothing to do with the anti-trust act and is concerned only with certain frauds in connection with the weighing of dutiable goods, whereby the government was deprived of duties which it should have received.

The argument as to the precise measure of immunity secured by the statute has been quite extended and a construction of the act contended for which we do not find it necessary now to pass upon when the sum total of all that Heike testified to under these subpœnas is enumerated it seems to us to fall so far short of what the statute plainly contemplates that there is little left to be said.

He testified, of course, that he was the person to whom the sub-

pœnas were addressed, secretary of the New York corporation and secretary and treasurer of the New Jersey corporation. That circumstance was well known when the subpœnas were prepared and addressed to him; he held these offices for many years; his official position was matter of record. To interpret the statute as securing immunity to an officer of a company for offenses committed while such officer, merely because he has stated under oath on some prior investigation that he was an officer, seems to us preposterous.

He testified as to the corporate history of the American Sugar Refining Company, of what prior concerns it was composed, and what refineries and other property it acquired, what stock (of its components) it exchanged its own for. But all this was merely a recital of what was disclosed by the books and papers of the corporation, which it had turned over through him to the grand juries themselves. Indeed, in these records and documents was the best competent evidence of its corporate history to be found; Heike's so-called "testimony" as to these subjects was but the preparation of an index to what they disclosed.

He testified before one of the grand juries that four certain checks of the American Sugar Refining Company which represented the Segal-Kissel loan were signed by him as treasurer; he looked at the checks and testified that he wrote the signatures. This was testimony given under oath in obedience to a subpœna; but he was not prosecuted in this action, nor was it sought to subject him to any penalty for or on account of the transaction, matter, or thing concerning which he so testified. There was no question in this action of the Segal-Kissel transaction. The four overt acts charged under the sixth count related to his signature of four checks; but the government did not seek to use the Segal-Kissel checks to make proof of his signature to the others. It is conceded that his admitted handwriting on the Segal checks could not even be used as standards of comparison to establish the signature to ones referred to in the sixth count (Hickory v. U. S., 151 U. S. 308, 14 Sup. Ct. 334, 38 L. Ed. 170), and no effort was made to do so. The suggestion that comparison of the signatures on the four checks of the sixth count with the four signatures on the Segal checks would have "enabled the investigator to determine that they were made by the same man and were in one and the same handwriting" seems to us overstrained. As secretary for many years of both companies, signatures concededly Heike's were scattered broadcast by thousands through the community. Indeed, no comparison was needed. The identity of name and office was quite sufficient for the investigator. Proof of the genuineness of the signatures of the sixth count was easily to be found without any reference to the testimony before the grand juries.

[2] There was furnished to the second grand jury a statement giving actual meltings of each company operated by the American from 1887 to 1907, showing the pounds of sugar melted each year in each refinery, which included the amount melted by the Havemeyer & Elder Refinery for the period covered by the prosecution. This statement was produced by Heike. On the trial of the present indictment

*it was essential to show the true weights of certain importations, and in order to enable the jury to determine what they were proof was made of the quantity actually melted at that refinery. As to these meltings the plaintiff in error contends:*

"But the kernel of the case lies in the proof of the actual meltings and the quantity of sugar produced at the Havemeyer & Elder Refinery. These meltings represented the weights made by the custom house employés on the dock. These weights presented the basis upon which were prepared the calculations and statistical table which were later on in the trial presented to the jury, and which purported to show that the result in manufactured product was greater than warranted by the number of pounds of sugar melted. This fact Mr. Heike testified to (before the grand jury)."

The government contends that this statement of total meltings was volunteered by Heike, and there is some uncertainty as to just how it was furnished. We disregard this, however, and will assume that the grand jury subpœna called for just such a statement, and that it was furnished to the grand jury in response to such a call.

It seems to us, however, that this statement was not in any true sense "testimony given" or "documentary evidence produced" by Charles R. Heike before the grand jury. Personally he knew nothing about the meltings and could himself give no competent testimony. As an officer of the company, he could require its clerks to prepare such statement from the records, which the grand jury already had under the subpœna duces tecum. The weighers who noted the scales and called off the readings, the checkers who recorded the amounts, the clerks who transcribed such records in the books, the corporation which had such weighings made and which preserved the records of them, the clerks who subsequently tabulated these records, may fairly be said to have contributed, each of them, testimony essential to proving that the tabulation was an accurate statement of the total weighings; but we cannot see that Heike had anything to do with it, except to inform the last series of clerks that the corporation which employed them wished them to make such a statement. When it was thus made up by the corporation, it certainly would be a matter of no importance whether it was actually transported to the grand jury room by one officer or employé or by some other one. The distinction between a corporation and its officers has not always been closely adhered to; but such distinction is accentuated in Wilson v. U. S., 221 U. S. 361, 31 Sup. Ct. 538, 55 L. Ed. 771 (May 11, 1911), where it is held that the subpœna duces tecum may properly be addressed directly to the corporation. The statement of meltings being a document prepared for the grand jury by the corporation and which the corporation under the subpœna was obligated to turn over to the grand jury, no matter which officer had the immediate custody of it, we fail to see why the performance of that corporation obligation to deliver the document by one of its officers can give him personal immunity in regard to anything which such statement, to which he has contributed nothing, contains.

The assignments of error which deal with the disposition of Heike's special plea are therefore overruled.

On the main case the first question which may be considered deals with the sufficiency of the indictment. The sixth count charges that defendants and others "conspired to commit offenses against the United States in and by knowingly making and effecting and aiding in effecting, at less than their true weights, and by means of false and fraudulent written statements as to said weights, entries of certain goods, wares, and merchandise, to wit, certain raw sugars, which then and there were subject to duty as aforesaid, and which theretofore, to wit, prior to March 1, 1907 had been imported, and which thereafter were continuously to be imported, into the United States, into the Port and Collection District of New York, through the collector of said port from foreign countries as aforesaid by the said American Sugar Refining Company of New York."

Upon arrival of sugars money was deposited with the collector sufficient to cover duties at the invoice weights. The sugars were then weighed by government weighers, and duties finally liquidated upon their return of weights. Certain of the conspirators were present at these weighings, tampered with the scales, and thereby made the apparent reading of weights registered on the dial or scale less than the true weight, in consequence of which the government weighers' written statement as to the weights was a fraudulently made false statement. Being accepted by the collector as true, return of excess duties over amounts deposited was made to the company which imported the sugar.

The sixth count is, under section 5440 of the U. S. Revised Statutes (U. S. Comp. St. 1901, p. 3676), which makes it a "crime if two or more persons conspire—to commit an offense against the United States." The offense to be committed must be a statutory one. The government contends that the offense which defendants conspired to commit was within the enumeration both of section 5445 of the U. S. Revised Statutes (U. S. Comp. St. 1901, p. 3678) and of section 9 of the Customs Administrative Act of 1890. Defendants argue that on March 1, 1907, the date of the alleged conspiracy, sec. 5445 was no longer in force. On March 3, 1863, an elaborate statute, consisting of 14 sections, was passed to prevent and punish frauds upon the revenue, to provide for the more certain and speedy collection of claims in favor of the United States, and for other purposes. When the revision of the statutes was prepared and passed, this statute was split up and its provisions distributed under appropriate titles. Section 3 of the original statute made it a criminal act for any one person to effect or aid in effecting an entry of merchandise at less than the true weight—"by the exhibition of any false sample, or by means of any false representation or device, or by collusion with any officer of the revenue, or otherwise." This section was modified and re-enacted in the revision under the head of "Crimes," as follows:

"Sec. 5445. Every person who, by any means whatever, knowingly effects, or aids in effecting any entry of any goods, wares, or merchandise at less than the true weight or measure thereof, or upon a false classification thereof as to quality or value, or by the payment of less than the amount of duty legally due thereon, shall be fined not more than five thousand dollars, or be imprisoned not more than two years, or both."

Concededly this was the law prior to June 22, 1874. On that date Congress passed a lengthy statute, entitled "An act to amend the customs revenue laws and to repeal moieties." This statute repealed "all acts and parts of acts inconsistent" with its provisions. The proposition contended for is that section 12 of the act of 1874 is so inconsistent with section 5445 as to work its repeal. That section reads as follows:

"Sec. 12. That any owner, importer, consignee, agent, or other person who shall, with intent to defraud the revenue, make, or attempt to make, any entry of imported merchandise, by means of any fraudulent or false invoice, affidavit, letter or paper or by means of any false statement written or verbal, or who shall be guilty of any wilful act or omission by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper, or statement, or affected by such act or omission, shall, for each offence, be fined in any sum not exceeding five thousand dollars nor less than fifty dollars, or be imprisoned for any time not exceeding two years, or both; and, in addition to such fine, such merchandise shall be forfeited; which forfeiture shall only apply to the whole of the merchandise in the case or package containing the particular articles or merchandise to which such fraud or alleged fraud relates; and anything contained in any act which provides for the forfeiture or confiscation of an entire invoice in consequence of any item or items contained in the same being undervalued, be, and the same is hereby, repealed."

[3] Where there is no express repeal of an earlier statute, the question whether or not a subsequent enactment, dealing with the same general subject and to some extent overlapping the older legislation, is to be construed as effecting its repeal, is a question of congressional intent. Did Congress intend merely to make additional provisions which might be affirmative or cumulative or auxiliary, or did it intend to provide a substitute which should take the place of the regulations it had already carefully prescribed? This being the test, it is unnecessary to discuss the many cases cited which bear upon the subject of repeal by implication. Manifestly the provisions of the two sections are not absolutely inconsistent so that both cannot stand, although they undoubtedly overlap. That Congress did not intend by the provisions of the anti-moiety act to repeal its express provisions as to offenses enumerated in section 5445 is evident from its subsequent legislation. Surely Congress must be assumed to know what its own intentions were, and it has declared those intentions most clearly by its enactment of the federal Penal Code, Act of March 4, 1909, which is a careful and comprehensive revision of all the existing penal laws. This Code re-enacts section 5445 as section 69 of the Code, and (by section 341) expressly repeals section 5445 by number, reserving (section 342) "rights accrued" under that or any other of the existing laws so repealed. If it had been the intent of Congress in 1874 to substitute section 12 of the act of 1874 for section 5445, it certainly would not have found it necessary expressly to repeal or to reserve rights under the latter in 1909.

[4] It is next contended that, if section 5445 were not repealed by section 12 of the act of 1874, it was repealed by section 9 of the customs administrative act of 1890. That section reads as follows:

"Sec. 9. That if any owner, importer, consignee, agent or other person shall make or attempt to make any entry of imported merchandise by means of any false or fraudulent invoice, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatever, or shall be guilty of any wilful act or omission by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof embraced or referred to in said invoice, affidavit, letter, paper or statement, or affected by such act or omission, such merchandise or the value thereof," etc.

Here we have in the later statute an enumeration of various fraudulent means for making an entry—invoice, affidavit, letter, paper, statement, practice, or appliance—while the earlier statute covers "any means whatever," a more exhaustive description. There is no repugnancy; both statutes can stand together, the latter being cumulative but not inconsistent. For this reason, and for those expressed in the preceding discussion, we think that section 5445 was not repealed by the customs administrative act.

[5] It is next contended at great length that, even if section 5445 were in force, the sixth count fails to set forth facts showing a conspiracy to commit an offense against it. The language of the indictment is quoted supra. It does not set forth all the details of the fraudulent scheme by which the government weighers were induced to make false written statements as to the weight of the imported sugar. But it charges in ordinary and concise language that defendants conspired to effect an entry of the sugars at less than their true weights, and that the means by which such entry was to be effected was false and fraudulent statements of the weight; certainly no person of common understanding could doubt what it was intended to charge, nor be misled as to pleading his acquittal or conviction to a subsequent indictment based upon the same facts. The indictment identifies the offense which defendants are charged with conspiracy to commit, and that is all that is required. Williamson v. U. S., 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278. There is nothing in the record to show that defendants were taken by surprise or were in doubt as to the precise offense with which they were charged. The case at bar is very different from Keck v. U. S., 172 U. S. 434, 19 Sup. Ct. 254, 43 L. Ed. 505, which merely charged that defendants imported into the United States diamonds of a stated value, "contrary to law and the provisions of the act of Congress." It is the conspiracy which is charged in this count—the conspiracy to commit the offense described in section 5445, or in section 5 of customs administrative act or both—and the statement in the count sufficiently identifies the object of the conspiracy.

We are at a loss to comprehend the suggestion that the sixth count was defective in that it omitted the allegation that the conspirators knew that the merchandise was dutiable. It avers that the defendants conspired to knowingly make entries of raw sugar which were subject to duty at less than their true weights. Why this does not charge them with knowledge that the sugars were dutiable, as well as that they were raw, we fail to see.

[6] It is argued that this count cannot be construed as charging a conspiracy to commit an offense of the kind defined by section 9 of the customs administrative act, and that the judge erred in instructing the jury that they might consider whether defendants conspired to commit such an offense.

The gist of this objection is that the sixth count does not, as plaintiffs in error contend, aver that by means of the intended acts the United States would be deprived of any part of the lawful duties accruing upon said merchandise. Without now expressing an opinion as to whether the clause of section 9 as to deprivation qualifies any part of said section which precedes the words "or shall be guilty of any act or omission," we think deprivation of duties is sufficiently averred by the statements that the raw sugars were subject to duty and that the object of the conspirators was to effect their entry at less than their true weights.

[7] It is contended that there was error in admitting certain dock books of the assistant United States weighers. In these were recorded by such assistant weighers the results of their observations of the scales, made at the time of weighing. These were official records of the government and produced from its files. Such records are not covered by the hearsay rule. It is elementary that they are prima facie evidence of what they purport to record.

In support of defendants' contention reference is made to section 1 of article 6 of the amendments of the Constitution of the United States, which provides that:

"In all criminal prosecutions the accused shall enjoy the right * * * to be confronted with the witnesses against him."

The scope of that provision was fully discussed by the Supreme Court in Mattox v. U. S., 156 U. S. 237, 39 L. Ed. 409,[1] where exception was reserved to the introduction of the stenographic report of the testimony of a deceased person given on a former trial. In overruling this exception the court said:

"We are bound to interpret the Constitution in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject—such as his ancestors had inherited and defended since the days of Magna Charta. Many of its provisions, in the nature of a bill of rights, are subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected. A technical adherence to the letter of a constitutional provision may occasionally be carried farther than is necessary to the just protection of the accused and farther than the safety of the public will warrant. For instance, there could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations. They are rarely made in the presence of the accused. They are made without any opportunity for examination or cross-examination. Nor is the witness brought face to face with the jury. Yet from time immemorial they have been treated as competent, and no one would have the hardihood at this day to question their admissibility."

The records in this case are clearly within the definition of public records approved by the same court in Evanston v. Gunn, 99 U. S. 660, 25 L. Ed. 306. They are official registers or records kept by per-

[1] 15 Sup. Ct. 337.

sons in public office in which they are required, either by statute or by the nature of their office, to write down particular transactions occurring in the course of their public duties or under their personal observation. Such records are admissible without calling the persons who made them, and have been so admissible from a time anterior to the adoption of the Constitution. See Rex v. Fitzgerald, 1 Leach, 20; Rex v. Rhoades, 1 Leach, 24; Rex v. Martin, 2 Camp. 100; and the various text-books on evidence. To exclude them now on the ground of nonconformation would be to give the individual a new guaranty which he did not have when the Constitution was adopted; an interpretation of that instrument which the Supreme Court has condemned.

The authorities cited by the defendant's counsel have no reference to such records as these. In Motes v. U. S., 178 U. S. 458, 20 Sup. Ct. 993, 44 L. Ed. 1150, a sworn confession of one of the defendants made in preliminary examination was held inadmissible because the absence of the witness was due to the negligence of the prosecution. In Kirby v. U. S., 174 U. S. 47, 19 Sup. Ct. 574, 43 L. Ed. 809, judgment of conviction against certain persons for theft was held to be received improperly on the trial of another person charged with receiving stolen goods as proof that the goods he received had been in fact stolen. In People v. Bromwich, 200 N. Y. 385, 93 N. E. 933, it was held that a mere certificate of the clerk of a court that a person's name was not found among the naturalization records of the court could not be admitted to prove that fact; the clerk who had made the search should have been called to testify. In State v. Thomas, 64 N. C. 74, People v. Mitchell, 94 Cal. 550, 29 Pac. 1106, and State v. Reidel, 26 Iowa, 430, the records offered in evidence were not governmental. People v. Goodrode, 132 Mich. 542, 94 N. W. 14, is similar to People v. Bromwich, supra. People v. Dow, 64 Mich. 717, 31 N. W. 597, 8 Am. St. Rep. 873, supports defendant's contention, holding that it was error in a trial for burglary to admit the official record kept by the officer in charge of a United States signal service station to show the condition of the weather on the night in question, without producing the man who made the observations. We are unable to concur in this conclusion; the record offered was the same sort of record, kept for governmental purposes by government employés, which was competent proof of the facts it purported to record before the Constitution was adopted, and we are not satisfied that by its adoption such proof was made incompetent. The case cited seems to us to be one of those referred to in Mattox v. U. S., supra, where a "technical adherence to the letter of a constitutional provision (has been) carried further than is necessary to the just protection of the accused and farther than the safety of the public will warrant."

[8] Error is also assigned to the admission of what are referred to as the "pink books." Besides the weighing of the sugar by the government officers for duty purposes, there was in the case of what are called "landed cargoes" a further weighing at the same time and place (on the docks) of the same sugar by certain city weighers in

conjunction with Sugar Company checkers. The city weighers represented the persons who had sold the sugar to the company and the weights ascertained and recorded on this second weighing were those on the basis of which the company paid for the sugar it had bought. The purpose of introducing this second record of weights was to show discrepancies between the two weighings, uniformly against the government, except during certain periods. Such discrepancy was corroborative of other direct evidence going to show that by tampering with the scales government weighers had been tricked into returning short weights.

The prosecution did not offer these as official government records, which manifestly they were not, but produced witnesses to prove them. The way these records were prepared was as follows: The city weigher placed a "draft" (a number of bags) of sugar on the platform, looked at the reading indicated on the scale, and announced it. The sugar company's checker's duty was to look at the scale so as to check the city weigher's reading and accurately to record the indicated weight of the draft in the "pink" book. This checker's record was dated and signed by the checkers page by page. The last man that completed a cargo made up the total of its weights, compared it with the city weigher, and turned it into the dock office, where it was again checked, and when found correct as checked up with the city weigher the weight was then sent up to the main office. The government proved that some of these checkers were dead. It was conceded that four of them had been indicted, tried, and convicted of the offense of conspiracy to defraud the United States in the entry of dutiable sugars, and also of the offense of making and entering and aiding in entering goods, being sugar, at less than the true weight thereof. The government did not call these four as witnesses, and of course the deceased checkers were not produced; the signatures of those not called were proved. The other checkers were called to the stand, and with the original entries before them testified thereto. It appeared that occasionally one of the regular checkers was temporarily absent—for lunch or some other purpose. When that occurred, his place would be filled by one of the other regular checkers, or by one of the samplers. The page on which the weights put down by these temporary substitutes appeared was signed by the regular checker whom they temporarily relieved. It was shown who were the samplers employed during the period in question, and that certain of them were dead and others could not, after diligent search, be found. All the other samplers were called. Some of them testified that they never were put in a checker's place. The others testified that they were sometimes so employed and that, when they were, they entered the weights of the drafts correctly. These books covered a long period of time and a great many different cargoes. As might have been expected, most of the witnesses when pressed on cross-examination admitted that there were occasions when they put down the weight the city weigher called out without actually seeing that it was accurate; sometimes a swaying of the scales made it difficult to see the register; sometimes attention was distracted trying to add

the preceding ten entries. To what extent this circumstance affected the substantial accuracy of the record was a question which was left to the jury to decide. They were told that "the weight of this class of evidence depends upon its accuracy," and that it had a bearing upon the questions they were to decide only "if. accurate or substantially accurate."

We have recently had occasion to discuss the admissibility of private records of a similar character—records of the business transactions of some nonofficial person kept by persons whom he employs to see that such transactions are correctly recorded. Wilson v. U. S. (C. C. A.) 190 Fed. 427 (August 20, 1911). They do not always prove themselves upon mere identification as government records do; but we are satisfied that in the case at bar there was sufficient proof of their substantial accuracy to warrant their admission in evidence. Once in, it was for the jury to say what weight was to be given to these records. There was much corroborative evidence. For example it was upon these weights, when checked with those of the city weighers, that the company paid for its sugar for months and years; and, as we have seen, the jury were told that they were to determine as to the accuracy. As to the constitutional point above referred to, it may be noted that the witnesses whose testimony made the records admissible testified before the jury, and were cross-examined, or opportunity given for cross-examination, which, in the case of some of the samplers, was not availed of.

Moreover, the so-called "pink books" were admissible even though it were not shown that in every instance they recorded the correct weight of the bags. Undoubtedly they showed the weights which the company checkers reported to the company as the weights found by the city weighers, and on the weights so reported the company paid for the sugar. That the government weights were false, less than the true weight, made so by fraudulent tampering with the scales, was abundantly proved by direct evidence, men who devised the details of the fraud, who bored the holes in the 17 frames and inserted the steel springs and by pressing them against the lever produced a short weight record on the scale testified to these facts. And those defendants who had been actually engaged in such weighing promptly withdrew their former pleas and pleaded guilty. The real question was whether knowledge and participation could be brought home to men higher up, one of whom at least was never on the docks. It was relevant and material to show that there were in the records of the company and brought to the attention of these men statements which showed that for a very long period of time the weights upon which duties were paid were uniformly less than the weights which the company's checkers reported as the true weight and on which reports the company paid for the sugar; that during a period when some controversy about rebates was pending (which might involve investigations), and after the president of the company had written a cautionary letter, this discrepancy ceased; and that when the rebate controversy was over the old condition returned. The extent of the discrepancy was a relevant and material fact, and the reported weights

given in the pink books tended to show such extent. It is true that no individual·pink book was in the hands of either of these plaintiffs in error, but it was proved and not disputed that the aggregate of the figures contained in them were incorporated in the melting weights which month by month were laid before each of them. The pink books showed the items which made up each monthly aggregate. Possibly the evidence was cumulative, the monthly aggregate of landed weights being sufficient to show discrepancies from duty weights; but it was not error to admit them.

[9] Error is assigned to the admission in evidence of what are called "the reconstructed technical statements." These were prepared by government experts from the books of the company, which were in evidence, to take the place of similar tabulations giving various percentages which have been prepared by employés of the company monthly during the period in question and shown to their superiors (it was admitted that one set of these—Table No. 2—was sent to the plaintiffs in error), but which original statements had at the time of the trial disappeared, through loss or destruction. The books were in court. The men who made the tabulations were called to the stand and cross-examined. One of them corrected his tabulation as a result of such cross-examination. Finally the trial judge, instructing the jury as to them, said: "You will give just such weight to these exhibits as you find that their accuracy or inaccuracy may merit or demerit." We find no error in their admission, nor in the admission of the charts which pictorially indicated what the figures in the tables showed.

[10] Error is also assigned to the refusal of the court to admit in evidence Exhibit A–40 for identification, being a summary tabulated statement of 22 cargoes of sugar showing an excess in city weighers weights over custom house weights in cargoes purchased by the American Sugar Refining Company upon the basis of cost freight and duty paid by the selling merchants. Since the company paid no duty on these cargoes, there was no inducement for the use by it or any of its employés of any fraudulent device to affect the custom house weight, and no checkers or tallymen of the company were at the scales. As to the fundamental question, whether or not the scales were for a long period of time tampered with by company employés and false weights in consequence returned by the government weighers, the testimony was overwhelming. The facts indicated by the exhibit showing weights of the 22 cargoes could in no way have affected the result if they had been admitted, viz., the conclusion that among the subordinate employés of the company there was a conspiracy of the sort charged in the indictment, which had been carried out for a long period of time. The only real question was whether men higher up in the service of the company, Bendernagle, Gebracht, and Heike, knew of this conspiracy and participated in it. Had it been shown that these men knew at the time of the discrepancy in weights when cargoes not subject to duty were weighed, the excluded testimony might have been material to be considered in connection with the testimony already in the case tending to show that they

knew of discrepancies against the government consistently appearing in cases where the company was to pay duty. That was the theory on which the exhibit seems to have been offered, as a circumstance calculated to induce a belief on Heike's part that the government weighers were always very liberal in their weighing, which might account for discrepancies in weights when the company was to pay duty. But Heike had no knowledge of discrepancies in the weights of these 22 cargoes until the trial, so that circumstance was not one to be considered by the jury in deciding as to his knowledge and mental processes when the fraudulent weighing was going on. We find no harmful error in the exclusion of this exhibit.

Some other assignments of error to the admission of testimony which are presented in the briefs of counsel for one or other of the plaintiffs in error do not require specific discussion. It is sufficient to say that we have examined them all and considered the arguments advanced in their support, but are not persuaded that the judgment should be reversed because of the admission of such testimony.

[11] The trial judge charged the jury as follows:

"The word *entry*, gentlemen, as used in the statute, means the entire transaction of putting the goods through the custom house, and this transaction is not completed until the duties are finally liquidated and paid, including the refunding by the government to the importer of any part of the amount paid as provisional duty."

This is assigned as error, and the same proposition, viz., that the word "entry" has a more restricted meaning, is advanced in other assignments of error. Thus it is contended that the prosecution must fail because "the entries were true." That means that the entries made upon arrival on the weights given in the invoices, before reweighing had reduced the figures, were substantially accurate. The offense charged, however, was the fraudulent tampering with the scales so as to trick the government weighers into returning weights less than the true ones; a liquidation of the original entries on basis of the false weights and a refund of the consequent difference in duties.

This court, in U. S. v. Legg, 105 Fed. 930, 45 C. C. A. 134, pointed out that:

"The term 'entry' in the acts of Congress is used in two senses. In many of the acts it refers to the bill of entry, the paper, or declaration which the merchant or importer in the first instance hands to the entry clerk. In other statutes it is used to denote, not a document, but a transaction, a series of acts which are necessary to the end to be accomplished, viz., the entering of the goods."

In our opinion the meaning of the word in the statutes now before us is no longer an open question. One of these statutes is the customs administrative act of 1890, section 9 of which makes it an offense to "make or attempt to make any entry of imported merchandise by means of any fraudulent or false invoice, affidavit, letter, paper or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever," etc. In U. S. v. Mescall, 215 U. S. 26, 30 Sup. Ct. 19, 54 L. Ed. 77, the

Supreme Court held that the word "entry" as used in this section must be given the broader meaning of the whole process of putting the goods through the customs. It follows that a like construction should apply to section 5445, which covers "every person who by any means whatever, knowingly effects, or aids in effecting any entry of any goods, wares or merchandise, at less than the true weight or measure thereof, or upon a false classification thereof as to quality or value, or by the payment of less than the amount of duty legally due thereon."

[12] It is assigned as error that the court denied the motion of the defendant Heike for a separate trial. This question was one within the discretion of the trial judge (U. S. v. Marchant, 12 Wheat. 480, 6 L. Ed. 700; U. S. v. Ball, 163 U. S. 662, 16 Sup. Ct. 1192, 41 L. Ed. 300) and upon the record here we are not persuaded that such discretion was abused.

[13] It is assigned as error that the court refused to allow defendants more than three peremptory challenges. At the time the offenses charged were committed, they were misdemeanors, entitling defendants to but three peremptory challenges. The contention is that by the subsequent passage of section 335 of the Penal Code (which went into effect January 1, 1910), they were accorded 10 peremptory challenges. In view of the saving clauses of the Code (sections 342, 343), we are satisfied that there was no error in prosecuting defendants in the same manner and under the same procedure as if the later act had not been passed.

It is contended by both plaintiffs in error that the trial court erred in sending the case to the jury; that the evidence was insufficient to warrant a conviction. We shall not rehearse the great body of proof upon which the jury rendered its verdict. It was overwhelmingly proved—we do not understand that it is disputed here—that for a long period of time the government was defrauded of duties by a systematic underweighing of sugar brought about by the concurrent acts of employés of the sugar company tampering with the scales. By this means the government was plundered of hundreds of thousands of dollars. The only person apparently who profited by this was the sugar company—except for the beggarly amount of excess wages it paid to the individuals who actually manipulated the scales, and the money paid them by the superintendent after they ceased work and were being prosecuted. The money thus paid by him the government contended was "hush money." The superintendent asserted that it was paid because he believed they were innocent, and did not wish them or their families to suffer because they were under a cloud of suspicion. That some one or more persons besides these understrappers were cognizant of the facts that sugars were being underweighed, and that the company was profiting thereby is a self-evident proposition. The briefs (one of them at least) assume that the president of the company knew what was going on. The fact of a conspiracy and of offenses against section 5445, U. S. Rev. Stat., and section 9 of the customs administrative act being thus fully proved, the only question for the jury was whether plaintiffs in

error were cognizant thereof and participated therein. The trial judge charged the jury as follows:

"The first question is: Did these men here on trial knowingly participate in the manner and at the time charged in the indictment in defrauding the government of its customs duties? If you are satisfied that they either had a part in the planning or hand in the execution of such fraudulent practice, or aided or abetted therein, then it is your duty to convict any or all of them as the evidence warrants. * * * To convict, the evidence should show a participation in the fraud, or the scheme to defraud, charged in this indictment, with knowledge of its existence. Participation without knowledge or knowledge without participation is not sufficient to convict. That is, if you find by the evidence that the defendants did something, or had some hand in the accomplishment of the fraud or scheme to defraud, but knew nothing of its existence, you should not convict; or if the defendants knew about it, but did nothing in furtherance of it, you should not convict. But if they did know of the fraud or of the conspiracy to defraud, and, in furtherance of it, did aid, abet, counsel, or advise, then you should convict."

The government showed that there came before these defendants monthly statements, which contained disclosures as to intake and output of the refinery, which it was contended indicated that the government weights were uniformly abnormally short, except during the brief period when disputes as to rebates produced a temporary cessation of the tampering with the scales. As to Heike, it was shown that he took action to effect a change in the methods of book-keeping by making additions to the intake figures after they reached headquarters, which it was contended was consistent only with knowledge that the government weights were being abnormally reduced, and with intent to cover up the transaction. Statements made and action taken by Gebracht were testified to, which it was contended were consistent only with guilty knowledge and participation. Letters written by both defendants were put in evidence. Finally they both took the stand, were examined and cross-examined at great length—a cross-examination in which some of the jurors participated. Of course, if the jury had credited their statements explanatory of the matters relied upon against them, they would not have convicted. But with those explanations set aside—as upon the verdict we must set them aside—there was sufficient in the record to warrant a finding of knowledge and participation on the part of each.

[14] There are many assignments of error which have not been specifically discussed. They are not of sufficient general interest to be included in the opinion. All of them, however, have been examined, and in none of them do we find sufficient ground for a reversal of the judgment.

The judgment of the Circuit Court is affirmed.