FARMER et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. May 12, 1915.)

Nos. 241–276.

1. CONSPIRACY ⬅32—CRIMINAL RESPONSIBILITY—ELEMENTS OF OFFENSE.

To establish a conspiracy, under Criminal Code (Act March 4, 1909, c. 321) § 37, 35 Stat. 1096 (Comp. St. 1913, § 10201), to commit a violation of section 215, punishing the use of mails to promote frauds, the government must prove an intent to defraud and a defrauding by the use of the mails.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 58, 59; Dec. Dig. ⬅32.]

2. POST OFFICE ⬦35—OFFENSES—ELEMENTS—"USING MAILS TO DEFRAUD."
The elements of the crime of using the mails to promote frauds, punishable by Criminal Code, § 215, are, first, a scheme intended to defraud, and secondly, an actual use of the mails; and one who devised a scheme to defraud with the intention to avoid all use of the mails in carrying it out, but who in carrying it out used the mails, committed the offense.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. ⬦35.

For other definitions, see Words and Phrases, First and Second Series, Defraud.]

3. CONSPIRACY ⬦47—CRIMINAL RESPONSIBILITY—EVIDENCE.
The intent of defendants charged under Criminal Code, § 37, with a conspiracy to violate section 215, punishing the use of mails to promote frauds, may be shown by circumstantial evidence; and where the scheme to defraud makes it apparent that it cannot be carried out without using the mails, the jury may convict, without further proof justifying the inference that defendants intended to use the mails.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. ⬦47.]

4. CONSPIRACY ⬦47—CRIMINAL RESPONSIBILITY—EVIDENCE.
Evidence held not to sustain a conviction of a conspiracy under Criminal Code, § 37, to violate section 215, punishing the use of mails to promote frauds.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. ⬦47.]

5. CRIMINAL LAW ⬦663—PRIVILEGE OF WITNESSES—WAIVER.
Accused, indicted for the use of the mails to defraud, in violation of Criminal Code, § 215, furnished bail at once, and then went to his office and there found post office inspectors, who had a subpœna duces tecum, calling for papers and threatening to remove them. A discussion followed, and the officers were permitted to remove the papers in bags, provided the bags would not be opened until accused should appear before the grand jury. The papers remained in the custody of the government until the trial, about two years later, and no application for their return was made until three days before the trial. The court, by consent of counsel, directed the placing of the papers in the custody of the clerk, giving accused and his counsel access to them. During the trial accused offered to prove that the papers were obtained from him involuntarily. Held that, though it be assumed that the officers exceeded their authority in removing the papers, and that the acts of accused on the occasion of their removal did not operate as a waiver to defeat his right to assert his constitutional privilege, his acquiescence in the disposition made of the papers by the court was a waiver of any right to ask for their return to him.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1602; Dec. Dig. ⬦663.]

6. POST OFFICE ⬦48—OFFENSES—INDICTMENT.
An indictment for misuse of the mails in furtherance of a scheme to defraud divers persons whose names are to the grand jury unknown, by selling books falsely represented to be rare and valuable, with offers to resell them for the victims at a higher price, and alleging in separate counts the mailing of letters in furtherance of the scheme to persons named, is sufficient, for the fact that the grand jury knew of the defrauding of the two persons named occurring in one case a year after the devising of the scheme, and in the other case 2½ years after that date, does not show the untruth of the statement that they did not know the names of the individuals whom defendants intended to defraud, but sufficiently advises defendants what charge they must meet in each count.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 67–80; Dec. Dig. ⬦48.]

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. POST OFFICE ⊕35—MISUSE OF MAILS—STATUTORY PROVISIONS.**

Where persons devised a scheme to defraud by misuse of the mails prior to the going into effect of the Criminal Code, their continuance of the scheme thereafter was the devising of a scheme after the going into effect of the Code.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. ⊕35.]

**8. POST OFFICE ⊕49—MISUSE OF MAILS—EVIDENCE.**

Under an indictment for misuse of the mails in furtherance of a scheme to defraud by selling books falsely represented to be valuable, and alleging the mailing of a letter to a person named, the letter referring to the contract of the person named, notifying him of the sending to him of books, acknowledging receipt of a specified sum and notes for the balance, and congratulating him on his securing rare and valuable sets of books, was admissible in furtherance of the scheme to defraud, because it was important to keep the person named satisfied with his bargain and unsuspicious until the notes were paid; the sale to him having been effected by the fraudulent methods charged in the indictment and practiced by defendants.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⊕49.]

**9. POST OFFICE ⊕49—MISUSE OF MAILS—EVIDENCE.**

A letter mailed by one of the defendants to a buyer of books, in response to her request for separate bills for separate sets sold, which stated that one of the parties to the fraud, who had induced the buyer to purchase books, was a dealer in special editions for himself and on his account, and that any books he obtained from the company through which defendant did business he paid for, and that nothing was known about the price for which the books were subsequently sold, nor to whom they were sold, was properly received in evidence in furtherance of the general scheme to defraud any one who could be persuaded to purchase books.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⊕49.]

**10. POST OFFICE ⊕49—MISUSE OF MAILS—INDICTMENT—PROOF.**

An indictment for misuse of the mails in furtherance of a scheme to defraud, which alleged that letters were placed in a post office of the city of New York, was sustained by evidence that the letter reached the respective addresses in due course, inclosed in envelopes post marked "New York, N. Y.," as against the objection that each letter might have been deposited in some substation or in a lamp post mail box.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⊕49.]

**11. POST OFFICE ⊕48—MISUSE OF MAILS—INDICTMENT—EVIDENCE.**

An indictment alleging that a dozen persons entered into a scheme to defraud by use of the mails justifies a conviction of only some of the persons, as against the objection of fatal variance between the scheme pleaded and the scheme proved.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 67–80; Dec. Dig. ⊕48.

Non-mailable matter, see notes to Timmons v. United States, 30 C. C. A. 79; McCarthy v. United States, 110 C. C. A. 548.]

**12. CRIMINAL LAW ⊕371—EVIDENCE—ADMISSIBILITY—SIMILAR OFFENSES.**

Under an indictment for misuse of the mails in furtherance of a scheme to defraud, in violation of Criminal Code, § 215, instances of frauds of exactly the same sort as charged, committed prior to the taking effect of the Criminal Code, were admissible to show intent.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830–832; Dec. Dig. ⊕371.]

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

13. Post Office ☞49—Misuse of Mails—Evidence—Admissibility.

Under an indictment for misuse of the mails in furtherance of a scheme to defraud by selling books falsely represented to be valuable, with offers to resell them for the victims at a higher price, letters passing between defendants while carrying out their schemes, relating to the scheme, were admissible to show intent and throw light on the methods of the scheme.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ☞49.]

In Error to the District Court of the United States for the Southern District of New York.

This cause comes here upon writ of error to review judgment of conviction of the plaintiffs in error upon an indictment charging them and several others with conspiracy and with devising a scheme to defraud and using the mails in furtherance thereof. Sections 37 and 215, Criminal Code.

Stated generally, the scheme was to induce persons to purchase books upon false representations, not only as to their rarity and value, but also as to the present existence of other persons of abundant means, who were ready and willing to purchase such books from the person to whom defendants sold them at a greatly advanced price; defendants representing that they would effect such resale to the profit of the original purchaser, but well knowing that the books could not be resold even at the price paid by the original purchaser and intending not to make any effort to effect such resale. The nature of the scheme will be more easily understood by reference to some of the facts brought out in the testimony.

In the New York office of the corporation, of which James J. Farmer was president, there was stationery from different hotels in Berlin, Paris, London, Vienna, and other cities, and stationery was sent to the office from Egypt. James J. Farmer would dictate to the stenographer a fictitious letter, purporting to come from Berlin or some other foreign city and to be written by some rich man. This would be addressed to Hartley, and would state that the writer had set aside $100,000 (or some other large sum) for a library which the writer proposed to purchase on returning from abroad, and that he desired Hartley to procure for him such and such sets of books, and that on his return he would buy them from him. This letter Farmer would have the stenographer or clerk copy on the appropriate foreign stationery, would sign a fictitious name to it, and would deliver or mail it to Hartley to be shown by the latter to the victims. It also appeared that upon one or more occasions, when one of the outfit was trying to induce some one to buy a set of books at an enormous price, he would be accompanied by another of them, who, under an assumed name, would state that he represented some rich person who was desirous of purchasing the same books and who would probably buy from the victim at an advanced price.

See, also, 218 Fed. 929.

Frank J. Gaynor, of New York City, Benjamin C. Bachrach, of Chicago, Ill., and R. M. Moore, of New York City, for plaintiffs in error.

H. Snowden Marshall, U. S. Atty., and Frank Morse Roosa, Asst. U. S. Atty., both of New York City, for the United States.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. [1, 2] The indictment contained five counts; the fourth and fifth were dismissed with the consent of the government; we need consider only the first three. Counts 2 and 3

charged a violation of section 215 of the Criminal Code. Count 1 charged a conspiracy (section 37) to commit a violation of that section (215). Under the first count, therefore, the government had to sustain a heavier burden of proof as to the *intent* of the conspirators than under the other two. Under 215 it is sufficient to show an intent on the part of the deviser or devisers of the scheme to defraud some one; it is no longer necessary to show an intent to use the mails to effect the scheme, as it was under section 5480, U. S. Rev. Stat. The deviser of the scheme may, at the time he planned it, have intended to avoid all use of the mails in carrying it out; nevertheless if, in carrying it out, he does use the mails, the offense is committed. There are two elements of the crime, a scheme intended to defraud and an actual use of the mails; both, of course, must be proved to warrant conviction. When, however, the charge is conspiracy to commit the offense specified in section 215, it is necessary to prove an intent, not only to defraud, but also to defraud by the use of the mails. The draftsman of the indictment fully appreciated this; the first count charges an intent to use the mails as well as an intent to defraud.

[**3, 4**] Upon a careful examination of the record we are satisfied that the government failed to prove an intent by the conspirators named in the first count to use the mails to effect the scheme. Direct evidence of intent is rarely available; it may be shown by circumstances. Usually when the scheme is unfolded it is apparent that it could not be carried out without using the mails, and a jury is therefore warranted, without further proof, in drawing the inference that those who devised the scheme intended to use the mails. We do not find in this record sufficient to warrant the inference that on January 2, 1910, when the conspiracy was formed, the conspirators intended to use the mails. The scheme here revealed is markedly different from others which have been before the courts (mainly under old section 5480), where it was evident that the scheme could not be successfully carried out without using the mails. Thus in the old "green goods game," no personal interview could be risked until, after an exchange of letters, it appeared that some individual was a person who might be safely trapped. When the scheme is to dispose of stock at inflated prices, advertisements have to be published calculated to bring inquiries by mail from many different places; in that way only can a sufficiently broad field be found for the dissemination of the securities. But in this scheme different tactics are required. Advertising in the hope of bringing responses from persons eager to pay $10,000 or $25,000 or $50,000 for a few books would be a waste of money. The only practical method is to find out by inquiry the names of persons likely to be fooled, and then to have them interviewed by one or more glib talkers and thus persuade them to buy through ingenious representations and the exhibition of letters, telegrams, newspaper clippings, samples, etc. When books in sets are bought, presumably they are sent by express, and the person who effected the sale personally takes the check that pays for them. Since inference is not enough to make out full intent under count 1, and there is no direct evidence of it, we think conviction under this count should be reversed.

Coming now to the conviction under counts 2 and **3**.

[5] Error is assigned to the admission of much of the documentary evidence on the ground that the letters, etc., were taken from defendant Farmer against his will in the violation of his constitutional rights. The facts are these: James J. Farmer was arrested November 14, 1912, and held to bail, which was at once furnished. He then went to his office, which was also the office of the corporation defendant, and found some post office inspectors, who had a subpœna duces tecum calling for all papers, etc., and were threatening to remove them. A heated discussion followed, at the close of which a Mr. Weill, a lawyer who was present as Farmer's legal adviser, asked the officers if they would give their word that, if the bags were sealed, they would not be opened until defendant Farmer should appear before the grand jury on November 15, 1912. The promise was given, the papers were put in the bags, the bags were sealed, and Weill went with the officers and the bags to Post Office Building, where the bags were deposited in an empty room. They remained in the custody of the government until the trial.

For the purposes of the present assignments of error, without discussing the question or considering the argument of the government as to the soundness of the two assumed propositions, it may be assumed:

1. That the officers exceeded their authority in removing the papers.

2. That the acts of defendant and his counsel (Weill) on the occasion of their removal did not operate as a waiver or estoppel to defeat defendant's right to assert his constitutional privilege and to insist on their return.

The case of Weeks v. U. S., 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, however, does not apply, because in that case defendant made "timely" application "in due season" for the return of his papers. In the case at bar no application for return was made for nearly two years, when upon a petition dated October 5, 1914, application was made to the trial judge on October 10, three days before the trial for such return. Thereupon "by consent of counsel for defendant and for the United States" the court directed that the papers should be "placed in the custody of the clerk of the court, and that defendant and his counsel should have access to said papers and full opportunity to read and inspect the same, and to make copies if desired." This was done.

In the course of the trial defendant Farmer offered to prove that the papers were obtained from him involuntarily; he made no offer to prove that he had applied to any federal court for their return prior to the motion made in October, 1914. We think that defendant's acquiescence in the disposition made of the papers by the court operated as a waiver of any right he might have had to ask for their return to him.

[6] It is contended that there was a failure of proof under the second and third counts, because the charge was that defendants devised a scheme to defraud divers persons, whose names were to the grand jury unknown. Defendants' argument treats this as if these counts charged two schemes, one to defraud Mrs. Preston, the other to defraud Evans. They tried to introduce proof to show that when

the indictment was found the jury knew that both these persons had been defrauded; the testimony was excluded and exception reserved. The objection now urged may be disposed of on the assumption that the grand jury did know of the defrauding of these two persons in 1911 and 1912. The scheme charged in these counts was a general one, not directed to the defrauding of any particular individual then identified, but of any and all persons whom the devisers of the scheme might thereafter persuade to buy their books. What the indictment charged was the intent of defendants on January 2, 1910; that intent was to defraud, but who the persons to be defrauded would be presumably defendants themselves did not then know. Mrs. Preston was not approached until the latter part of 1910; Evans not until July, 1912, two years and six months after the scheme was devised. If defendants did not on January 2, 1910, devise a scheme against either of these persons, the grand jury was quite justified in charging that they (the grand jurors) did not know the names of the persons whom on that day defendants intended to defraud. It is expressly held in Durland v. U. S., 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709, that omission to state the names of the parties *intended* to be defrauded is satisfied by the allegation, if true, that such names are to the grand jury unknown. Knowledge by the jury that the schemers defrauded Mrs. Preston a year after they devised their scheme, and Evans 2½ years after such date, would not show the untruth of a statement that the jurors did not know the names of the individuals whom the schemers on January 2, 1910, intended to defraud. Defendants were fully advised what charge they had to meet under each count. Devising a scheme to defraud generally any one whom they might catch in their net would not by itself constitute an offense under section 215. The actual use of the mails in furtherance of the scheme was a fact essential to be charged and proved. The second indictment charged the mailing of the Preston letter; conviction under that count could not be secured unless the mailing of that letter in furtherance of the scheme were shown. The mailing merely of other letters to other persons would not sustain conviction under this count. The same is true as to the Evans letter charged under the third count.

We do not see why all rights of defendants were not fully protected under this indictment. If Larkin v. U. S., 107 Fed. 697, 46 C. C. A. 588, be interpreted as holding otherwise, we cannot concur with it.

[7] We may next refer to the proof. Leaving out of consideration the other parties whom the government indicted, but (except for the one who pleaded guilty) did not convict, there is abundant evidence that on January 2, 1910, John J. Farmer, Hartley and Glenn Farmer (who was not tried under the indictment) did devise a scheme to defraud. Evidence properly admitted to show their intent indicates that they were engaged in this enterprise for a year or more before that time; continuing in it after the Criminal Code went into effect (January 1, 1910) was in law the devising of a scheme on the date charged. The scheme was of the sort set out in the indictment. Of course, at the time they did not have in mind all the particular individuals to be defrauded in this way; they contemplated defrauding any and every one whom they could persuade to part with his or her

money. This is proved beyond any possible doubt, reasonable or otherwise, as to all three. The correspondence passing between them, notably between J. J. Farmer and Hartley, reeks with fraud in every letter, except the few written in curt business phraseology, so that they could be shown in court, if necessary, to present the appearance of an honest producer of books, extra illustrated and handsomely bound, dealing at arm's length with a purchaser, who took his own risk of effecting a resale. That the letters passing between the two convicted defendants, the one on the firing line keeping the one at headquarters advised as to his every move, were in furtherance of the scheme, no .intelligent mind can for a moment doubt.

[8] The indictment letter charged in the second count, mailed by J. J. Farmer to Evans, Glassport, Pa., July 29, 1912 referring to his contract, notifying him of the sending of the books, acknowledging receipt. of $500 and notes for $3,400, and congratulating him on his securing two rare and valuable sets of books, was certainly in fur- therance of the scheme charged. The defrauding of Evans would not be fully accomplished till the notes were paid; it was important to keep him satisfied with his bargain and unsuspicious until then. The sale was effected by the same fraudulent methods, charged in the in- dictment and repeatedly practiced by all three (the convicted defend- ants and Glenn Farmer); the government's case on .this count was fully proved.

[9] The indictment letter under the third count was written and mailed by J. J. Farmer to Mrs. Preston March 21, 1911. By that time the books had been delivered and the price paid. It refuses a request to send her separate bills for the separate sets sold her stating:

"Mr. G. F. Farmer is a dealer in special editions, for himself and on his own account. Any goods that he got from this company, he paid for, and we know nothing about the price for which they were subsequently sold, nor to whom they were sold. Consequently we cannot comply with your request to furnish you individual bills for the sets mentioned."

If it stood alone, this letter might not be significant, but with the illumination of the situation which the record affords we think it may fairly be considered as written in furtherance of the general scheme. The scheme was not to defraud a particular individual (e. g., Mrs. Preston), but to defraud whomever the parties to the scheme could persuade to buy. Having been once swindled by Glenn Farmer and Hartley, Mrs. Preston and others in Boston to whom she might relate her experience would probably be immune to the further blandish- ments of these two enterprising agents; but if the man who got up the books and was evidently the head of the enterprise could persuade her that the publishing house knew nothing of Glenn Farmer and his coadjutor in the swindle, except that Glenn had bought books from J. J. Farmer and resold them entirely on his own account, possibly Boston might still remain a territory receptive of the J. J. Farmer books, when cultivated by other of his enterprising agents.

[10, 11] Counts 2 and 3 charged that the indictment letters were "placed in the post office in the city of New York." The evidence showed that these letters reached the respective addresses, in due

course, inclosed in envelopes postmarked "New York, N. Y." The suggestion that each letter should have been excluded, because it might have been deposited in some substation or in a lamp post mail box is too frivolous for consideration. So, too, is the contention that because the government charged that a dozen persons entered into the original scheme, and failed to prove the guilt of all of them, therefore there was a fatal variance between the scheme pleaded and the scheme proved.

[12] The instances of frauds of exactly the same sort as those charged in the indictment, committed by one or more of the defendants prior to January 2, 1910, were admissible to show intent. There is nothing in our opinion in Marshall v. U. S., 197 Fed. 511, 117 C. C. A. 65, to support a contrary contention. The Marshall Case, as we pointed out on motion for its reargument, was sui generis; there was nothing in the opinion to indicate that the wholesome practice of showing intent by a party's own acts was to be abrogated. A single sale of a single book, even at an exorbitant price, might not necessarily satisfy one that there was intent to defraud; but repeated similar transactions might well, as in the case at bar, demonstrate an intention to conduct a swindling enterprise.

[13] Plaintiffs in error, referring to letters passing between the defendants while they were carrying out their scheme, cites U. S. v. Ryan (D. C., E. D. Ark.) 123 Fed. 634. Without inquiring whether that case was or was not correctly decided under old section 5480, it is sufficient to say that under section 215, Criminal Code, conviction was had in this case only upon the indictment letters set out under the second and third counts. The letters inter partes were clearly admissible as showing intent and casting light upon the methods of the scheme devised.

Only three alleged errors in the charge have been argued. The first deals with the conspiracy count already disposed of. The second is concerned with transactions prior to January 2, 1910, which has been discussed above. The third is based upon an exception "to the statement contained in the charge that the jury can convict under the indictment if they found separate fraudulent schemes." The disposition made of the conspiracy count makes it unnecessary to consider this.

The judgment is reversed as to the first count and affirmed as to the other two; such affirmance sustains the sentence.