## DAVIDSON et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. June 7, 1921.)

No. 3462.

1. **Conspiracy ⬳47—May be established by inference from concert of action.**
   It is not essential to establish conspiracy that actual proof be offered of a definite plan or agreement entered into by conspirators, but it is sufficient if the evidence shows a concert of action in the commission of the unlawful act or other facts and circumstances from which the natural inference arises that the unlawful, overt act was in furtherance of a common design, intent, and purpose of the alleged conspirators.

2. **Criminal law ⬳1159 (2)—Appellate court cannot weigh evidence.**
   In a criminal case an appellate court cannot determine the weight of evidence, but only whether there is substantial evidence that will sustain the verdict and judgment.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; John M. Killits, Judge.

Criminal prosecution by the United States against Harry Davidson and others. Judgment of conviction, and defendants bring error. Affirmed.

John J. Sullivan, of Cleveland, Ohio, for plaintiffs in error.

Jos. C. Breitenstein, Asst. U. S. Atty., of Cleveland, Ohio (E. S. Wertz, U. S. Atty., of Cleveland, Ohio, on the brief), for the United States.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge. On the 26th day of March, 1920, the federal grand jury returned into the United States District Court for the Northern District of Ohio, Eastern Division, an indictment against these plaintiffs in error and John A. Moore. The first count of this

indictment charges conspiracy to commit the offense of unlawfully, knowingly, and willfully interfering with the transmission of telephone messages over and by means of the telephone system of the United States while under control of the United States government. The second count charges the actual commission of this offense.

Upon the trial of the cause John A. Moore was, by direction of the court, found not guilty on either count.

Harry Davidson and James A. Smith were found guilty upon both counts. Richard Gavigan and Thomas Prendergast were found not guilty as charged in the first count, but guilty of the offense charged in the second count of this indictment.

Motions for new trial and in arrest of judgment were overruled, and separate sentences were imposed.

The plaintiffs in error ask a reversal upon two grounds:

(1) That the verdict is not sustained by sufficient evidence.

(2) Error of the court in the admission of evidence.

There are other assignments of error, but these are the only ones discussed in the brief of counsel for plaintiffs in error, and the only ones upon which counsel now rely.

Under the provisions of section 1011 of the Revised Statutes of the United States, this court has no authority to pass upon the weight of the evidence. Therefore, if there is any substantial evidence tending to support the verdict of the jury, the judgment of the trial court must be affirmed, in so far as this assignment of error is concerned.

It appears from the evidence that some time prior to July 23, 1919, the date of the alleged offense, a telephone union had been organized in the city of Cleveland and an official strike called by the Operators' Union and telephone men. These plaintiffs in error were not members of that union. Davidson and Smith were members of the Electrical Workers' Union, and Gavigan and Prendergast had filed their application for membership in the Electrical Workers' Union. While this strike was in progress the Bell telephone cables to the city hall were cut, and, on the day that the defendants are charged in the indictment with having committed this offense, workmen were employed in splicing and repairing these cables. This attracted a crowd at the city hall, and a large number of policemen were required to keep this crowd back from the place where the workmen were employed. Davidson was in front of the city hall where this crowd had assembled, both in the forenoon and afternoon of that day. Smith was there in the afternoon while this work was in progress. The evidence also shows that the nature of their employment required them to be at the city hall from time to time each day. This applies particularly to Davidson, but the testimony shows that his business at the city hall was inside the hall, and not out where the workmen were employed in repairing the telephone cable. The evidence, however, shows that he was outside watching this work during a large part of the entire day, and that he manifested considerable interest in it. One of the workmen engaged in this work of repair testified that Davidson asked him what he was going to do and he told him that the cables had been cut and "we are going to

fix them." Davidson replied, "I don't think you are." McMahon, the workman, then said to him, "The city hall is all out of service, and they have got to have service." To this Davidson replied, "The hell with the city hall." McMahon further testified that upon his return to this work after dinner, Davidson was standing at the same place where he was standing in the morning, when he had the first conversation with him; that, when he came up to Davidson he said, "Hello, Harry," or something to that effect, and that thereupon Davidson said to him, "Oh, go to hell; I don't want to talk to you."

C. M. Zimmerman, a post office inspector, testified that he saw Davidson there in the afternoon; that he was talking with a group of men about the men out at the manhole who were engaged in repairing the telephone cable; that he said they were "strike breakers, and had been imported from out of town, or words to that effect"; that Davidson and the men with whom he was talking "were congregated in the doorways on the landing"; that the police officers asked them to move away, and also asked them if they had any business there. Davidson replied, "Yes; I have as much business here as these fellows," pointing to the witness and another post office inspector named Smith, and Mr. Pannell a special agent of the Department of Justice. This was 2:30 in the afternoon. About 3:30 p. m. the plaintiff in error Smith came up the steps where Davidson was still standing. Davidson stopped him and asked him where he was going, but witness did not hear Smith's reply. Davidson then said to Smith, "Stick around; there may be something doing here pretty soon." Shortly after this the defendant Moore came up the steps where Davidson, Smith, and others were standing and said to them, "It's too damned bad somebody don't throw a bunch of bricks over there among those strike breakers."

[1] A charge of conspiracy is one that is not easily susceptible of direct proof, nor is it essential to establish conspiracy that actual proof be offered of a definite plan or agreement entered into by conspirators. It is sufficient if the evidence shows such a concert of action in the commission of the unlawful act, or such other facts and circumstances upon which the natural inference arises, that the unlawful, overt act was in furtherance of a common design, intent, and purpose of the alleged conspirators to commit the same. Calcutt et al. v. Gerig (C. C. A. 6) case No. 3451, decided February 18, 1921, 271 Fed. 220; Alaska S. S. Co. v. Longshoremen's Ass'n (D. C.) 236 Fed. 964; Farmer v. U. S., 223 Fed. 903–907, 139 C. C. A. 341.

This evidence discloses that Davidson, by his remarks from time to time, not only identified himself with the crowd that collected about the men engaged in making these repairs, but demonstrated that his sympathies were with the strikers; that he was opposed to the repair of these cables and antagonistic to the workmen employed in making the same. Not only did his statements to these workmen and to the police officers who asked him to move, evidence that he had more than passing interest in the transactions of that day, but his statement to Smith, "Stick around; there may be something doing here pretty soon," manifested his readiness to join in the accomplishment of the purpose of this conspiracy as stated in the indictment. The presump-

tion obtains that some motive prompts all human conduct. This evidence tends strongly to show the motive of both Davidson and Smith in remaining there, idly watching these operations, when the duties of their employment would naturally require their presence elsewhere. In view of the nature of the offense charged in the first count of this indictment, and the established rule of evidence permitting proof of facts and circumstances from which the natural inference arises that the unlawful overt act was in furtherance of a common design, intent, and purpose, coupled with the further fact that the evidence tends to connect and identify some of these alleged conspirators with the preceding transactions of that day, the admission of this evidence was not error. Nor did the court err in admitting the evidence of the statement made by Moore when he approached Davidson, Smith, and others congregated in the doorway of the city hall watching these workmen repair the cables. It is, of course, true that this statement of Moore, standing alone, would not tend to prove a conspiracy between Davidson and Smith, but the attitude of Davidson and Smith toward these workmen, and particularly the attitude of Davidson, at whose request Smith had remained in proximity to where these men were engaged in the work of repair, had been fully shown by the evidence, and from that evidence it appears that Moore made no mistake in addressing his remarks to these men; for the sentiments he expressed were in line with the sentiments expressed by Davidson several times before Moore came upon the scene. Davidson had already expressed his antagonism to the making of these repairs. He had refused, when requested by the policemen, to leave this overcrowded place. On the contrary, he insisted that he had just as much right there as the post office inspectors and the special agent of the Department of Justice. The statement made by Davidson to Smith, "Stick around; there may be something doing here pretty soon," clearly evidenced Davidson's purpose in remaining there. The purpose of Smith is evidenced by the fact that he did "stick around," and that shortly thereafter there was "something doing." From this evidence the jury had a right to find that there was an understanding, arrangement, and agreement between Davidson and Smith to remain at the place where these cables were being repaired for the purpose of awaiting an opportunity for accomplishing the identical purpose of the conspiracy as charged in the indictment.

But, if this evidence were wholly disregarded, the evidence in relation to subsequent events would be sufficient to sustain a conviction not only on the second count, but also of the crime charged in the first count of this indictment. It is wholly immaterial just when this conspiracy was formed. It is sufficient for the purposes of this indictment if the conspiracy was entered into immediately preceding the overt act. The evidence in this case tends to prove that Riley and Creps, two employés of the telephone company, had been sent by their superior officers, under guard of Kent and Fisher, to the private telephone exchange in the city hall to test out these lines; that they fully informed Miss Clark, who was in charge of this exchange, that they

were there for that purpose; that, finding the Bell lines were not yet in operation, one of them asked her to give him an Ohio state line, which she did, and over which he talked with Mr. Galloway, the senior test man, and also to Mr. Sheil, supervisor of cables, informing them that the Bell telephone lines were not yet in operation, and receiving from them instructions to sit down and wait for ten minutes and then call again. While these men were waiting Miss Clark left the room. She testified in this respect that she left the room for the reason that she considered herself insulted because one of the men had said in her presence, "What in the hell is it her business?" and that thereupon she left the room and went down to the first floor to the "Muny Light" trouble room and communicated that fact to some men there. The evidence tends to prove that shortly following this communication these plaintiffs in error, with three or four others, came up to the private exchange room and forcibly drove Riley and Creps from their work, assaulting, striking, and severely injuring one of them; that an assault was also made on Kent, who was one of the guards; that as soon as these plaintiffs in error and others in their company came into the room these two workmen told them their business and exhibited their badges showing that they were in the employ of the telephone company; that Davidson then said to them, "To hell with the company; we don't pay no attention to them things." Creps and Riley then started for the door, but the young lady who had summoned these men said, "I am closing this door," and shut one of them. The evidence also tends to prove that the language used in the presence of Miss Clark by some of plaintiffs in error, and others with them after they came into the exchange room, was not only much more profane and offensive than the alleged statements by one of the workmen that Miss Clark claims insulted her, but that they also called these workmen vile and indecent names. The evidence as a whole is not inconsistent with the conclusion that Miss Clark took no offense whatever and did not consider that she had been insulted by the profane and indecent language used by her champions. It is also a significant fact, if it is a fact, that when Creps and Riley started to leave the room she said to them, "I am closing the door," and shut one of the doors. There is also evidence in this record tending to prove that when Miss Clark returned to the private exchange room she leaned over and said to her friend, Miss Burkett, "There will be some fun here in a minute." It would therefore appear that the government offered some substantial evidence in relation to Miss Clark's conduct from the time these workmen entered the exchange room until the end of the transaction in question, tending to prove that Miss Clark's attitude was antagonistic, not only to the repair of these cables, but also to the men employed in that enterprise.

On the other hand, the evidence offered by the government tends to prove that neither of these workmen made the statement attributed to them by Miss Clark, and which she says she communicated to the plaintiffs in error in the trouble room of the Muny Light. They each deny having made any such statement. Her friend Miss Burkett, who was

there waiting to go home with her, heard no such language. She talked with these men and found nothing objectionable in their conversation or their demeanor. She did not understand that they were trying to insult any one.

If the jury believed the evidence offered on the part of the government in reference to the conduct of these plaintiffs in error, and particularly the language used by them when they reached the telephone exchange room that evening, it would be justified in finding that such words and conduct were wholly inconsistent with the theory of the defense that these men came there merely to protect Miss Clark from being insulted by the use of profane language in her presence by the workmen Creps and Riley. The jury would also be justified by this and other evidence offered on behalf of the government in reaching the conclusion that the reason given by Miss Clark for calling these men to her assistance was not in fact a reason, but an excuse, and that back of this there was a more substantial motive, not only upon her part, but upon the part of these plaintiffs in error, who proceeded forthwith in a summary manner to put these objectionable workmen and their guards to flight.

[2] There is, of course, a substantial conflict in all this evidence, not only relating to the transactions of the day, but also in reference to this transaction in the evening in the private exchange room at the city hall. This court, however, cannot determine the weight of the evidence. The only question for its determination is whether there is any substantial evidence that will sustain this verdict and judgment, and to that question there can be but one answer.

The judgment of the district court is affirmed.

---

⬤⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes