## BURNS v. UNITED STATES. *

(Circuit Court of Appeals, Eighth Circuit. April 8, 1922.)

No. 5775.

1. **Criminal law ⬾622(1)—Separate trial of defendant jointly indicted is within court's discretion.**

   Whether a severance and separate trial shall be granted a defendant jointly indicted with others is a matter within the discretion of the trial judge.

2. **Criminal law ⬾1169(7)—Admission of evidence of statements of one defendant harmless, where other defendant subsequently testified to same effect.**

   The admission of evidence of statements by one defendant that another defendant was interested with him in a business, if error, was not prejudicial to the second defendant, who later went on the stand and testified that he and the first defendant were to share the profits.

3. **Criminal law ⬾423(1)—Letters written by one conspirator admissible against another.**

   If there was sufficient testimony to support a finding that a conspiracy existed, then the act of one conspirator in furtherance of the common purpose was in law the act of all, and letters written by certain of the conspirators were admissible against another conspirator.

4. **Criminal law ⬾656(1)—Comment by court on testimony not erroneous.**

   In the federal courts comments by the court on the testimony within permissible limits are not erroneous.

5. **Conspiracy ⬾32—In prosecution for conspiracy to use mails in aid of fraudulent scheme, intended use of mails is essential element.**

   The intended use of the mails is a substantive element of the offense of conspiracy to violate Criminal Code, § 215 (Comp. St. § 10385), and without proof of such element a conviction cannot be sustained.

6. **Conspiracy ⬾41—Party bound by what others did, if in contemplation of parties.**

   A party to a conspiracy is bound by what his coconspirators did in furtherance of the accomplishment of the conspiracy, if such acts were in contemplation of the parties to the unlawful combination.

7. **Conspiracy ⬾44½—Evidence held to warrant inference that party knew mails were to be used and were being used.**

   Evidence held sufficient to warrant the inference that defendant, a lawyer and business man, who was a party to a conspiracy to defraud by obtaining money on false representations that it was to be used in buying and selling live stock and would produce large profits, knew before the end, if not at the inception, of the scheme, that the mails would be used and were being used by other parties to the conspiracy and that he acquiesced therein.

8. **Criminal law ⬾862—Jury may use own knowledge and experience in drawing inferences.**

   In passing on the question whether a fact is logically deducible from the circumstances in evidence, the jury had a right to use their common knowledge and experience.

   Sanborn, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

C. T. Burns was convicted, with others, of conspiracy to commit an offense, and he brings error. Affirmed.

⬾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Rehearing denied July 7, 1922.

W. P. McGinnis, of Muskogee, Okl. (Cliff V. Peery, of Muskogee, Okl., on the brief), for plaintiff in error.

John T. Harley, Asst. U. S. Atty., of Coalgate, Okl. (Frank Lee, U. S. Atty., of Muskogee, Okl., on the brief), for the United States.

Before SANBORN, STONE, and LEWIS, Circuit Judges.

LEWIS, Circuit Judge. Plaintiff in error, Howard Banks, and S. E. Edwards, Jr., were jointly indicted, tried, convicted and sentenced on the charge of having conspired (Criminal Code, § 37 [Comp. St. § 10201]) to commit an offense against the United States, to-wit, to vio-late section 215 of that Code (Comp. St. § 10385), and that certain al-leged overt acts were done by some of them to effect the conspiracy. The fraudulent scheme set up in the indictment was that the defend-ants falsely represented that they were associated together and engaged in the business of buying cattle and hogs and shipping and selling them at Kansas City, Chicago, St. Louis, Wichita, and other cities, that they were realizing and expected to continue to realize large profits by reason of certain understandings and agreements had by them with the Nation-al Live Stock Exchange of Kansas City, Armour & Co., and Swift & Co., that large profits would be returned to all those who intrusted to them money to be invested by them in the said business of buying and selling cattle and hogs, and that the use of the U. S. Postal service was contemplated to carry out the scheme. It was charged that the conspiracy had existed at all times from May, 1917, to April 24, 1919. The defendants all resided at Muskogee, Okla. Burns is a white man and a lawyer; Banks and Edwards are negroes. Banks conducted a restaurant, grocery, and meat market at Muskogee, and beginning in 1912 or 1913 borrowed from time to time small sums from Burns, which he repaid. He testified that Burns disclosed to him about 1917 a plan for the organization and financing of a corporation to engage in the cattle business, that Burns wanted him to solicit and raise from colored people money to be turned over to Burns to put into the com-pany, that when it was first suggested he did not think much of it, but that later he took it up and, acting on Burns' suggestion, induced a great many negroes to turn their money over to him on the representa-tion that he and Burns were buying and selling cattle and hogs at large profits through their arrangement with the National Live Stock Ex-change, Armour & Co., and Swift & Co., that they were making large profits for themselves and would make large profits for those who saw fit to invest, and that he turned over to Burns the money which he received from negroes, to a total amount of from $40,000 to $50,000. Some of the money thus obtained was repaid in part in small amounts to the contributors from time to time by Banks, on the statement that they were dividends on their investments. Several negroes who were induced to give their money to Banks appeared as witnesses, and from their testimony, corroborated by canceled checks, they paid over in some instances as much as $5,000 or $6.000, and many contributed less sums. Edwards wrote, signed and mailed letters in 1918 and 1919 in which he solicited money for the scheme. Banks also wrote and mail-ed some letters. These letters were set up as overt acts. Edwards, in

the early part of 1919, went to Kansas City and sent telegrams, some to Banks and some to Burns, which he signed in the name of the National Live Stock Exchange, a fictitious concern, in which it was falsely represented that a large number of cattle were then in the yards at Kansas City, shipped there by Banks, and that large amounts would be shortly remitted therefor. On April 19, 1919, he wired to Burns as follows:

"Buy heavy in hogs and cattle. Market is good and indications are it will be even better for several months to come."

As a matter of fact, no cattle or hogs were shipped to market by any of the defendants. Banks testified that these communications were understood by Burns and that they were for the purpose of misleading the officers of certain banks from which Burns and Banks together had obtained large sums then unpaid. Banks fled in the latter part of April, but was arrested and brought back. At the time he left he and Burns were indebted to the First National Bank of Muskogee on notes which they had signed for about $16,000. They had also dealt with the Central State Bank of Muskogee and had given that bank their joint notes for large amounts, but owed it nothing when the exposure came. There can be no doubt of the existence of the fraudulent scheme as charged and the use of the postoffice in aid of its accomplishment; but Burns' defense and his insistence here is that he also was deceived and misled by Banks, that although he knew that Banks claimed to be engaged in buying and selling cattle and hogs, and although he had signed notes with Banks in order that he might obtain funds for that purpose, yet he had no knowledge that Banks' representations in that regard were false but believed that they were true, and that he also sustained substantial losses on account of having signed these notes. He testified however, that Banks was to divide with him the profits which were made on the cattle and hogs; that was to be the consideration to him for signing the notes. He denied that he requested Banks to obtain money for him to be used for the purpose of organizing and promoting a company to deal in live stock. Burns owned 80 acres of land not far from Muskogee, and when Banks fled there were about 100 hogs there which had been bought by Banks. Burns had fenced it for that purpose. Banks testified that Burns advised him to leave the country and gave him $275 for that purpose. Burns denied this. Banks was sick and confined to his home for several weeks in January and February, 1919. Burns went to see him many times while he was sick. On some days he made two or three visits. Banks testified that he and Burns each had a book that were just alike, which showed the contributions obtained by him from colored people, the amounts given by each, and the amounts that had been paid back to them in pretended dividends, that Burns made up both books, and he kept one in his possession at his store and Burns kept the other. Burns denied this. Banks testified that when Burns talked to him about getting up his company in 1917 he told Banks they would need $150,000, and that if he could raise it among his people Banks would get 30 per cent. of the stock in the company. Burns denied all these statements. The Muskogee bank evidently became suspicious early in

April, 1919. It heard that Banks was buying cattle and hogs around Vinita, and it asked Burns to go there and find out about the situation. He took a cashier's check from the Muskogee bank for $9,800 and deposited it in the Vinita bank to his credit. He then rode out in the country with Banks and a man who lived in that vicinity and had cattle, for the purpose of seeing the cattle and hogs that Banks said he intended to buy. When they came back Burns gave Banks a check on the Vinita bank for $5,000, which Banks said was to pay for hogs over at Bushyhead. Burns signed other checks payable to Banks but left the amounts blank, and returned to Muskogee. Banks testified that Burns told him when they returned to Vinita from the country that they were not ready to buy at that place. Banks then shifted the deposits at Vinita through checks for various amounts to other banks, except some small amounts that were otherwise utilized, but none of it was used to buy cattle or hogs. Banks, however, had added to Burns' account in the Vinita bank by putting in a check for $2,500 given by Berry Bailey, a negro who had been induced by the fraudulent representations of Banks to invest. He also made an $80 deposit in that account. That $2,500 and the $80, as well as the first deposit of $9,800 made by Burns there in his own name, all went out on checks drawn by Burns. The account was opened with the Vinita bank April 3, 1919, and closed on the 14th of that month. Banks took away from that bank in currency on checks that had been signed by Burns $4,880. That bank also wired to the Kansas National Bank of Wichita $5,000 out of the amount in Burns' account, to be credited to Banks by the Wichita bank. Banks then went to Wichita, and with the amount wired from the Vinita bank and the cash that he took he opened up an account there of $10,000, which was shortly remitted to the Central State Bank at Muskogee. In the preceding month he deposited $9,600 in the Claremore bank, and on the same day asked that bank to wire the full amount to the First National of Muskogee. Thus there was a shifting of funds and a checking back and forth, as claimed by Banks in his testimony, to give color to the claim that the money was needed at different points for the purpose of buying cattle in those vicinities. Banks, though an accomplice, was corroborated in many respects by other evidence. Burns insisted throughout that he knew nothing about the fraudulent scheme and that he believed all the while that Banks was buying and selling cattle. But such implicit confidence shocks the intelligence of the most credulous, and is contrary to ordinary experience. He had been signing notes with Banks for large amounts; he admitted that he was to share in the profits; he made the trip to Vinita at the request of the bank for the express purpose of finding out about the purchase of cattle there; he fenced his 80 acres to hold for shipment the hogs to be bought by Banks from time to time; and he appears to have maintained intimate relations with Banks for several years.

[1-4] Seven errors are assigned and argued. First, that the court erred in overruling a motion of Burns for a severance and separate trial. But that was a matter within the discretion of the trial judge, and we do not find that it was abused. Richards v. U. S., 175 Fed.

911, 99 C. C. A. 401; Heike v. U. S., 192 Fed. 83, 112 C. C. A. 615. It is also argued that the court erred in permitting several witnesses to testify to statements made to them by Banks when they turned over their money to Banks, to the effect that Burns was interested with him in the cattle and hog business. Conceding this to have been error, it is not prejudicial because Burns later went on the stand and testified that he and Banks were to share the profits. Error is assigned that letters written by Banks and Edwards, soliciting funds, were admitted over Burns' objection. But if there was sufficient testimony to support the finding that the conspiracy existed as charged, then the act of one conspirator in furtherance of the common purpose is viewed by the law as the act of all conspirators. Comments of the court on the testimony are also assigned as error; but the rule in the Federal courts is otherwise. The limits to which the court may go in that respect need not be defined, for we think it clearly appears that the trial judge did not violate the permissible rule.

[5-7] The only error assigned which requires serious thought and consideration is the overruling of the motion of Burns for a directed verdict in his favor at the close of all the evidence; which raises the inquiry as to whether there was evidence to establish the different elements of the offense charged—and particularly the element of an intended use of the postal service. As to that it is contended that, conceding the conspiracy to defraud, the case was not made out against Burns and brought within Federal cognizance without proof that he agreed expressly or impliedly that the mails were to be used as a part of the fraudulent scheme, and that there is no such evidence. Farmer v. U. S., 223 Fed. 903, 139 C. C. A. 341; Schwartzberg v. U. S., 241 Fed. 348, 154 C. C. A. 228. The intended use of the mails was a substantive element of the offense charged, and if the contention that there is no proof to sustain that element is well taken, the conviction of Burns cannot be sustained. No one testified that Burns expressly consented to use the mails as a part of the alleged scheme, and there is no evidence that he personally made use of it to accomplish the unlawful purpose, but that his co-defendants only did so. Of course, he is, bound by what they did in furtherance of its accomplishment if those acts were in contemplation of the parties to the unlawful combination. It can hardly be expected in such a case that explicit proof can be had of the exact terms of the unlawful agreement. Experience teaches that the case must be made out from circumstantial evidence. The court submitted the inquiry to the jury as to both elements on all the facts, and the question in its last analysis is this: Did those facts establish a premise from which the jury might logically and reasonably draw the inference that the future use of the mails as a part of the scheme was intended by all defendants, including Burns?—for a logical and reasonable inference is as much an established fact in a case, as facts that are established by direct proof. Andujar v. Hani (C. C. A.) 277 Fed. 62, 64; In re Pierce, Butler & Pierce Mfg. Co., 246 Fed. 814, 816, 159 C. C. A. 116; Kellogg v. U. S., 126 Fed. 323, 326, 61 C. C. A. 229. In Clark v. Manchester, 64 N. H. 471, 13 Atl. 867, it is said:

"When a material fact is not proved by direct testimony, it may be inferred by the jury, if there is a case for them, from the facts which have been so proved, even though the inference be not a necessary one. It is their province to draw proper inferences from such facts, and if, in the exercise of this right, they conclude that the fact in controversy is established, it is as properly proved as if by direct testimony."

And in Doyle v. B. & A. Ry. Co., 145 Mass. 386, 14 N. E. 461, the Supreme Court of Massachusetts said:

"But a fact proved by a legitimate inference is proved no less than when it is directly sworn to. Com. v. Doherty, 137 Mass. 245, 247."

We are not unmindful of the rule that the inferred fact must have an immediate connection with or relation to the established fact from which it is inferred. Manning v. Insurance Co., 100 U. S. 693, 697, 25 L. Ed. 761. Wharton's Law of Evidence, vol. 2, § 1227, says that inferences of fact "are always rebuttable and are determinable by free logic"; and Greenleaf (15th Ed.) vol. 1, § 44, says that such inferences (presumptions) "are derived wholly and directly from the circumstances of the particular case, by means of the common experience of mankind, without the aid or control of any rules of law whatever." The trial judge, in submitting the case to the jury, was of opinion that the circumstances adduced established a premise from which the inference might be lawfully drawn, and the jury by its verdict found that the use of the mails as a part of the scheme was a fact logically deducible from the circumstances in evidence, hence an established fact in the case.

[8] In passing on the question they had a right to use their common knowledge and experience, and in view of all the circumstances we are not prepared to say that their conclusion was unreasonable and illogical. It cannot be doubted that Burns knew long before the end, if not at the inception of the scheme, that the mails would be used and were being used, and that he acquiesced therein. The scheme was long-continued. It was far-reaching and unrestricted territorially. It included many and large financial transactions with banks, in which Burns participated, not only at Muskogee but at other points. He gave many checks. Banking transactions often utilize the facilities of the mail service. He was not only a lawyer possessing, presumptively, a broad knowledge of the business world, but he appears also to have been something of a business man with no small credit. He could have hardly anticipated that the scheme could be carried on without using the mails in connection with some of the transactions which it would involve; he was a partner with Banks, on intimate terms with him in business and could not have been wholly ignorant of what Banks was doing, and of the receipt of money from many sources in various amounts; and for these reasons we cannot sustain the contention.

Other assigned errors have had our attention, but we believe them to be without merit.

The judgment is affirmed.

SANBORN, Circuit Judge (dissenting). This is not a prosecution for the misuse of the mails for the purpose of carrying out the scheme

to defraud denounced by section 215 of the Criminal Code. If it were, a conspiracy to use the mails to defraud would not be essential to the commission of the offense, and it would be sufficient to prove that a scheme to defraud was devised and one or more of those who devised the scheme, used the mails to carry it out and the fact that one of the parties to the scheme thus misused the mails, would be competent evidence against the other parties to the scheme although they did not participate in and were ignorant at the time of the misuse of the mails to effect the fraud.

On the other hand, this is a prosecution for the offense of forming the conspiracy denounced by section 37 of the Criminal Code to misuse the mails to commit the offense denounced by section 215 and it was indispensable to the conviction of the defendant Burns of this offense that there should be substantial proof that when he participated in the formation of or joined the conspiracy he had the criminal intent that the mails should be used to execute it. Such an intent, it is held, may be inferred from the fact that the conspiracy is impossible of execution without the use of the mails but that it is not lawfully inferrable from the fact that other members of this conspiracy used them in effecting the scheme to defraud. In other words, one may join in a scheme or artifice to defraud and yet stop short of intending to use the mails for that purpose, and in such a case he is not guilty of the conspiracy denounced by section 37. Schwartzberg v. United States, 241 Fed. 348, 352, 353, 154 C. C. A. 228; Farmer v. United States, 223 Fed. 903, 907, 139 C. C. A. 341; Lefkowitz v. United States (C. C. A.) 273 Fed. 664, 666. In the case in hand, the use of the mails was not necessary to the execution of the alleged scheme to defraud. I am unable to find any evidence in the record that Burns ever used the mails to defraud anyone or that he ever knew that either Banks or Edwards used them to defraud any of their victims until after all the harm had been done.

For that reason, it seems to me that the court below ought to have instructed the jury to return a verdict in favor of Burns, and that the judgment below ought to be reversed.